

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR ― 1 2013

CLERK, U.S. DISTRICT OF COURT
By _____
            Deputy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

LONNIE W. GAIGE,       §
    PLAINTIFF,       §
                §
VS.                §     CIVIL ACTION NO. 4:12-CV-008-A
                §
MICHAEL J. ASTRUE,      §
COMMISIONER OF SOCIAL SECURITY,   §
    DEFENDANT.      §

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

## FINDINGS AND CONCLUSIONS

### I.     STATEMENT OF THE CASE

Plaintiff Lonnie W. Gaige ("Gaige") filed this action pursuant to Sections 405(g) and

1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the

Commissioner of Social Security denying his claims for a period of disability and disability

insurance benefits under Title II and for supplemental security income ("SSI") under Title XVI

of the Social Security Act ("SSA"). In January 2009, Gaige protectively applied for disability

insurance benefits ("DIB") and SSI, alleging that his disability began on October 16, 2007.[1] (Tr.

16-17, 117-20, 133.)

---

[1] After the hearing before the administrative law judge ("ALJ"), Gaige amended his alleged onset date to October 16, 2007. (Tr. 1058.) He originally claimed other onset dates, including September 15, 2006 and July 3, 2007. (*See, e.g.*, Tr. 18, 117, 133.)

1

His applications were denied initially and on reconsideration, and Gaige requested a hearing before an ALJ. (Tr. 16, 65-72, 75-84.) On June 16, 2010, the ALJ held a hearing, and, on August 25, 2010, the ALJ issued a decision that Gaige was not disabled. (Tr. 16-28, 34-60.) Gaige filed a written request for review, and the Appeals Council denied his request for review on November 7, 2011, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 1–5, 11.)

## II.     STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern disability insurance and SSI benefits. *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416 (SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920 (2009). First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v.*

*Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to

determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.[2]

## III. ISSUES

In his brief, Gaige presents the following issues to the Court:[3]

A. Whether the ALJ properly evaluated the medical opinion evidence in the record;

B. Whether the ALJ erred by failing to fully consider Gaige's mental impairments; and

C. Whether the ALJ erred at Step Five in finding that Gaige is not disabled because there is work that exists in the national economy that Gaige can perform.

## D. ADMINISTRATIVE RECORD AND ALJ DECISION

The ALJ, in his August 25, 2010 decision, stated that Gaige had not engaged in any substantial gainful activity from July 3, 2007 to September 30, 2009, the date on which Gaige was last injured for disability benefits under Title II. (Tr. 18.) He further found that Gaige had the following "severe" combination of impairments: (1) post-traumatic degenerative lumbar and thoracic disc disease, (2) acute renal failure (resolved), and (3) mood disorder. (Tr. 18.) Next, the ALJ held that none of Gaige's impairments or combination of impairments met or equaled the severity of any impairment in the Listing. (Tr. 19.) As to Gaige's residual functional capacity ("RFC"), the ALJ stated:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work, as defined in 20 CFR [§§] 404.1567(a) and 416.967(a), except he must be able to alternate sitting and

---

[2] There are four elements of proof that must be weighed in determining whether substantial evidence of disability exists: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history. *See Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[3] In his brief, Gaige sets forth only two issues as follows: (1) whether the Commissioner gave due consideration to the medical evidence in the record and (2) whether the Commissioner carried his burden at Step Five in determining that there was work that existed in significant numbers in the national economy that Gaige could perform. (Plaintiff's Brief ("Pl.'s Br.") at 1.) However, for clarity and ease of understanding, the Court will separate its discussion into three issues as indicated.

standing, as desired, to alleviate pain or discomfort; also, due to pain and effects of pain medication, he is limited to simple, repetitive job tasks. He can then work full-time at this residual functional capacity on a consistent, sustained basis and maintain employment for an indefinite period of time.

(Tr. 19 (emphasis omitted).)

The ALJ opined, based on this RFC assessment, that Gaige was not able to perform his past relevant work. (Tr. 26-27.) The ALJ found, however, that Gaige was able to perform a number of jobs that existed in significant numbers in the national economy during the time period at issue. (Tr. 27-28.) Thus, the ALJ concluded that Gaige was not disabled. (Tr. 28.)

## E. DISCUSSION

### A. Consideration of Treating Source

Gaige claims, in general, that the ALJ erred in rejecting the medical source statement of Dr. Alan Hurschman, M.D. ("Dr. Hurschman"), one of his treating physicians. (Pl.'s Br. at 9-13.) In an RFC evaluation dated July 27, 2009, Dr. Hurschman opined the following: (1) Gaige could sit for two to three hours and stand and/or walk for less than two hours in a full-time job setting; (2) it was necessary for Gaige to lie down or elevate his feet about hip height for eight hours per day to relieve pain or fatigue; (3) Gaige could maintain a sitting posture without having to stand, walk, or lie down for thirty minutes to one hour; (4) Gaige could not push or pull greater than five pounds; (5) Gaige could lift, carry, and/or upward pull ten pounds on an occasional basis and less than ten pounds on a frequent basis; (6) Gaige could never climb ramps, stairs, ladders, ropes, or scaffolds, balance, stoop, kneel, crouch, crawl, or reach in all directions (including overhead); (7) Gaige did not have the ability to perform sustained work activity; and (8) no "physiologic improvement" was anticipated. (Tr. 1020-22.)

As to Dr. Hurschman's treatment of Gaige, the ALJ, noting that Dr. Hurschman was a pain management specialist (Tr. 20 n.3), stated:

An initial consultation with Alan Hurschman, M.D., on May 20, 2008 reflected full, active lower and upper extremity range of motion, but lumbar range of motion was slightly limited in all planes except for left lateral flexion. Straight leg raise was positive at 60 degrees, but there was no sensory, reflex, or motor loss at all and the claimant's gait was normal. The claimant rated pain at level 2 with medication and level 8 without medication. On August 4, 2008, Dr. Hurschman performed radiofrequency neurotomies procedures affecting multiple lumbar disc levels, as well as right medical branch nerve injections. However, follow-ups reflect these procedures failed to yield much in the way of pain relief. Dr. Hurschman then performed lumbar epidural steroid injections on March 5, 2009 (Exhibit 8F).

On July 27, 2009, Dr. Hurschman prepared a functional capacities evaluation indicating the claimant could sit two or three hours or stand/walk less than two hours in an eight-hour workday. He also estimated the claimant would need to frequently lie down or elevate his feet, as often as eight hours a day. Lifting would be limited to ten pounds or less, and Dr. Hurschman opined the claimant could perform no postural maneuvers, e.g., climbing, balancing, stopping, kneeling, at all. Overall, he believed the claimant could perform no work on a sustained basis. (Exhibit 32F).

But when the claimant received some physical therapy through Dr. Hurschman's clinic in September 2009, the therapist observed that (despite deconditioning and muscle spasm) the claimant had no increase in pain following exercise (Exhibit 34F, p. 6).

On February 11, 2010, Dr. Hurschman performed a thoracic epidural steroid injection. The claimant had acknowledged pain medications took care of his lower back pain, but he still had pain in his mid-back (Exhibit 28F, p. 17).

. . . .

The medical opinions of a claimant's treating physician are ordinarily entitled to considerable weight in the disability determination process and must be evaluated under the factors set forth in 20 CFR [§§] 404.1527(d), 416.927(d) and Social Security Ruling 96-2p . . . .

I considered Dr. Alan Hurschman's August 2009 functional capacities evaluation indicating the claimant is essentially unable to complete an 8-hour workday because of limitations in sitting, standing or walking (Exhibit 32). However, my review of the copious medical records of Dr. Hurschman, as well as all the other specialist physicians, yielded no persuasive evidence of such marked functional limitations. Though Dr. Hurschman once observed straight leg raise was positive at 60 degrees, there was no sensory, reflex, or motor loss at all and the claimant's gait was normal. The claimant rated pain at level 2 with medication. Even after falling from a ladder and aggravating his back pain in

June 2009, a physical examination by Dr. Hanson was grossly normal. There was no sensory, reflex, or motor loss and his gait was normal. In addition, his mood and tone were positive and his judgment appeared to be appropriate. He had been off his psychoactive medications but depression remained better than in the past (*Id.*, at pp. 3-4). Therefore, I find Dr. Hurschman's functional capacities evaluation not only internally inconsistent, but also inconsistent with the other remaining evidence, as well; though he is no doubt a well-intentioned advocate for his patient, it would appear he is not familiar with the medical, vocational aspects of disability I am required to consider as trier of fact in this case.

(Tr. 20-21, 25-26 (footnotes omitted).)

As to Gaige's credibility, the ALJ stated:

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

. . . .

In final summary, I believe that the level of subjective pain-related and other limitations alleged by the claimant is overstated (however unintentionally) and therefore is not a reliable measure of his residual functional capacity. Although he may sincerely believe that substantial limitations exist, I considered his testimony and found that it was not credible in the sense of establishing disability. I therefore gave it only limited weight, in view of the very substantial evidence to the contrary relevant to those functional limitations. His credibility is further compromised by substantial evidence of overuse of narcotic medication, as well as a rather poor work record for several years before the date he alleges he became disabled.

(Tr. 23, 26 (citations omitted).)

Gaige first argues that the ALJ erred by determining that Gaige's "medically determinable impairments could reasonably be expected to cause some of his alleged symptoms" and then opining that Dr. Hurschman's RFC evaluation "yielded no persuasive evidence of such marked functional limitations." (Pl.'s Br. at 9-10; *see* Plaintiff's Reply Brief ("Pl.'s Reply") at 2.

Gaige claims that "[h]aving found that the Plaintiff has the impairments which could cause his symptoms, the ALJ is not free to substitute his medical judgment and determine that the medical evidence does not support the symptoms." (Pl.'s Br. at 10.)

Gaige's argument, however, is unpersuasive as it appears he is improperly intertwining the ALJ's analysis in making a credibility determination with the ALJ's analysis in rejecting Dr. Hurschman's RFC evaluation. In evaluating a claimant's subjective complaints, the ALJ first considers whether there is a medically determinable impairment that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. §§ 404.1529, 416.929; Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). Once the impairment is found, the ALJ evaluates the intensity, persistence and limiting effects of the symptoms on the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p, 1996 WL 374186, at *1.

In this case, the ALJ's finding that "the claimant's medically determinable impairment could reasonably be expected to cause some of his alleged symptoms" (Tr. 23) was an essential element in the ALJ's credibility determination and was within the province of the ALJ. *See Clark v. Astrue*, No. 1:09-CV-122-C, 2010 WL 3835248, at *4 (N.D. Tex. Sept. 30, 2010). It was not inconsistent for the ALJ, in evaluating Dr. Hurschman's RFC evaluation, to reject such evaluation as long as he properly followed the procedures for evaluating a treating source opinion and substantial evidence supports his decision, as will be discussed *infra*.

Gaige next argues that the ALJ erred in rejecting the RFC evaluation of Dr. Hurschman without applying the required factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). (Pl.'s Br. at 10–11.) Controlling weight is assigned to the opinions of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not

inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983). However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett*, 67 F.3d at 566; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). Conclusory statements to the effect that the claimant is disabled or unable to work are legal conclusions, not medical opinions, and are not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

In *Newton v. Apfel*, the Fifth Circuit Court of Appeals held that "absent reliable medical evidence from a treating or examining specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527." 209 F.3d 448, 453 (5th Cir. 2000); *see* 20 C.F.R. § 416.927. Under the statutory analysis of 20 C.F.R. §§ 404.1527 and 416.927, the ALJ must evaluate the following: (1) examining relationship; (2) treatment relationship, including the length, nature, and extent of the treatment relationship, as well as the frequency of the examination(s); (3) supportability; (4) consistency; (5) specialization; and (6) other factors which "tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c); *see also* 20 C.F.R. § 416.927(c); SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996).

In reaching his RFC determination, the ALJ reviewed voluminous amount of medical evidence in the record, including the following: (1) a June 8, 2009 examination in which Gregory Hanson, M.D. ("Dr. Hanson") noted that, even after recently falling off a ladder, a physical

examination of Gaige was "grossly normal" and there "was no sensory, reflex, or motor loss and his gait was normal" (Tr. 20; *see* Tr. 437-39); (2) physical examinations between December 2007 and August 2009 by Basil Bernstein, M.D. ("Dr. Bernstein"), that were *generally* within normal limits with no conspicuous musculoskeletal or neurological findings noted (although Gaige reported that he was experiencing pain) (Tr. 21-22; *see, e.g.,* Tr. 469-714 ); (3) a physical examination on August 19, 2009  by  Felipe Garcia, Jr., M.D. ("Dr. Garcia"), that was "completely within normal limits" (Tr. 22; *see* Tr. 867-871); and (4) a physical examination in December 2009 in which Dr. Garcia noted that Gaige was addicted to prescription medication and found that, except for hypertension and limited spinal range of motion due to pain, Gaige's physical exam was within normal limits and that "[p]ain behavior exhibited by [Gaige] during the examination was considered a Waddell's sign (Tr. 22-23; *see* Tr. 994-998).

Assuming without deciding that the ALJ was required to go through the factors set forth in 20 C.F.R. § 404.1527(c) and 416.927(c) before rejecting Dr. Hurschman's August 2009 RFC evaluation,[4] the Court concludes that the ALJ did properly evaluate Dr. Hurschman's August 2009 medical source statement using the factors set forth in such regulations. As to factors one and two under which the ALJ evaluates the examining and treatment relationship between Gaige and Dr. Hurschman, the ALJ thoroughly reviewed Gaige's treatment history with Dr. Hurschman and the numerous times Gaige was examined and treated by Dr. Hurschman. (Tr. 20-21, 24.)

---

[4] As noted above, pursuant to *Newton*, the ALJ is required to perform a detailed analysis of the treating physician's views under the factors set forth in 20 C.F.R. §§ 404.1527(c) & 416.927(c) only if there is no reliable medical evidence from another treating or examining physician that controverts the treating specialist.   209 F.3d at 455–57.  An ALJ does not have to perform a detailed analysis under the factors in the regulation "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than the another," as well as in cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *see Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 507–11 (S.D. Tex. 2003); *Contreras v. Massanari*, No. 1:00-CV-242-C, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001) ("The Court's decision in Newton is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant.")

*See* 20 C.F.R. §§ 404.1527(c)(1)–(2), 416.927(c)(1)–(2). In addition, it is clear that the ALJ

recognized Dr. Hurschman was one of Gaige's treating physicians as he set forth the law

regarding evaluating a treating physician's opinion immediately prior to discussing Dr.

Hurschman's August 2009 medical source statement. (Tr. 26.) As to factors three, four, and six,

under which the ALJ evaluates the supportability and consistency of physician's opinion as well

as any other factors which "tend to support or contradict the opinion," the ALJ pointed out the

internal inconsistencies between Dr. Hurschman's own examination records and the medical

source statement as well as the inconsistencies in his treatment records with the other medical

evidence in the record. (Tr. 26; *see* 20 C.F.R. §§ 404.1527(c)(3)–(4), (6), 416.927(c)(3)–(4),

(6).) As to factor five under which the ALJ considers whether the physician is a specialist, the

ALJ, while recognizing that Dr. Hurschman was a "pain management specialist" (Tr. 20 n.3),

emphasized that there were many other "specialist physicians" who did not support Dr.

Hurschman's opinion that Gaige has such "marked functional limitations" (Tr. 26; *see* 20 C.F.R.

§§ 404.1527(c)(5), 416.927(c)5).) Because the ALJ did properly consider the treatment records

and opinions of Dr. Hurschman and went through the factors listed in 20 C.F.R. §§ 404.1527(c)

& 416.927(c) before rejecting Dr. Hurschman's August 2009 RFC evaluation, the Court

concludes that the ALJ did not err. Thus, remand is not required.

## B. Mental Impairments

Gaige also argues generally that the ALJ failed to fully consider his mental impairments.

(Pl.'s Br. at 11-13; Pl.'s Reply at 3-4.) With respect to Gaige's mental impairments, the ALJ

found that Gaige suffered from a severe mood disorder (Tr. 18) and that such disorder caused a

moderate restriction in his daily activities; mild difficulties in his social functioning, and "no

mild deficiencies of concentration, persistence, and pace;" and no episodes of decompensation

(Tr. 25). In reaching this conclusion, the ALJ reviewed the voluminous amounts of medical evidence in the record, including the following: (1) a June 8, 2009 examination in which Gaige reported to Dr. Hanson that he had been off his psychoactive medications but that his depression remained better than in the past (Tr. 20; *see* Tr. 438); (2) a December 21, 2007 examination in which Dr. Bernstein noted that Gaige had reported he had no anxiety, depression, or sleep disturbances (Tr. 21; *see* Tr. 708); (3) a January 21, 2008 examination in which Dr. Bernstein indicated that Gaige suffered from recurrent major depression and anxiety (Tr. 21; *see* Tr. 696-97); (4) a May 21, 2009[5] examination in which State Agency Medical Consultant ("SAMC") Christopher Anagnostis, Ph.D. ("Dr. Anagnostis") diagnosed Gaige with "major depressive disorder recurrent, moderate" and assigned Gaige a global assessment of functioning ("GAF") score[6] of 55[7] (Tr. 22; *see* Tr. 737-43); (5) a January 15, 2009 examination with Dr. Garcia in which Gaige denied depression or anxiety (Tr. 22; *see* Tr. 881-82); and (6) an April 23, 2010 psychiatric evaluation in which Robert Knipstein, M.D. noted that Gaige's affect was blunt, his mood was depressed, and he was well-oriented and not delusional or psychotic, and assigned Gaige a current GAF score of 50[8] (but 60 during the past year) (Tr. 23; *see* Tr. 1036-39).

---

[5] The ALJ incorrectly listed the examination date as March 23, 2009. This error is harmless as it does not affect Gaige's substantial rights. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have not been affected."). To be entitled to relief, the claimant must establish that the ALJ erred and that the ALJ's error casts into doubt the existence of substantial evidence to support the ALJ's decision. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

[6] A GAF or Global Assessment of Functioning score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (DSM-IV).

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

[8] A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

As to Gaige's mental impairments, the ALJ, *inter alia*, stated:

> The claimant told Dr. Anagnostis, the consultant psychologist, that depression was not as bad as long as he was taking his medication. The only abnormality was depressed mood and flat affect. Nevertheless, the claimant was able to answer every question concerning general knowledge, abstract reasoning, memory, concentration, judgment, and insight. He denied any history of thought disorder, excessive or unreasonable fears, or obsessive or compulsive behaviors. He reported no symptoms of delusions, past or present.

> The several examining physicians reporting in this record also observed the claimant was well-oriented and not delusional or psychotic. But revolving [sic] doubt in his favor, I find that restriction of daily activities is moderate, based on his testimony that he seldom leaves the house during the day.

> Socially, however, limitations are only mild. He is able to attend medical appointments, visit his niece and nephew, and run errands for his roommate. He was pleasant and cooperative with health care providers.

> Similarly, I believe concentration, persistence, and pace are no more than mildly affected. That is consistent with Dr. Anagnostis' mental status examination *and* with the claimant's testimony he reads, watches political programs on television, and uses the computer.

(Tr. 24-25 (emphasis in original).)

Gaige argues that the majority of the evidence shows that Plaintiff's "present level of functioning indicated at least moderate symptoms, with GAF scores of 40 to 55 reported for current functioning." (Pl.'s Br. at 11.) A GAF score is not, however, determinative of a claimant's ability to work. *See Fuller v. Astrue*, No. 4:09-CV-197-A, 2010 WL 5566819, at *8 (N.D. Tex. Oct. 13, 2010), *adopted in* 2011 WL 94549 (N.D. Tex. Jan. 11, 2011). Federal courts have declined to find such a strong correlation between an individual's GAF score and the ability or inability to work. *See* 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) (declining to endorse the GAF scale for use in Social Security and SSI disability programs, and stating that the GAF scale "does not have a direct correlation to the severity requirements in our mental

disorders listings"). *See also, e.g., Kennedy v. Astrue,* 247 F. App'x 761, 766 (6th Cir. 2007); *Wind v. Barnhart,* 133 F. App'x 684, 692 n.5 (11th Cir. 2005); *Andrade v. Astrue,* No. 4:11-CV-318-Y, 2012 WL 1106864, at *10 (N.D. Tex. Feb. 13, 2012), *adopted in* 2012 WL 1109476 (N.D. Tex. Apr. 2, 2012).

Gaige also claims that the ALJ's determination that he suffered from "no mild deficiencies of concentration, persistence, and pace" (Tr. 25) is inconsistent with the opinion of Dr. Anagnostis, the SAMC, that "Plaintiff's mental impairments may impact upon his ability to attend and concentrate, as well as to complete tasks."[9] (Pl.'s Br. at 11; *see* Tr. 741.) An ALJ is to consider all medical opinions in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence (from non-examining sources) at both the administrative hearing and Appeals Council levels of administrative review. 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-6p, 1996 WL 374180, *2-4 (S.S.A. July 2, 1996). Pursuant to SSR 96-6p, the ALJ and the Appeals Council are not bound by the state agency physician's opinions, but may not ignore them and must explain the weight given to these opinions in their decisions. SSR 96-6p, 1996 WL 374180, at *2.

---

[9] Dr. Anagnostis actually opined:

**Ability to Complete Tasks Timely and Appropriately**:
　　The claimant reported having some difficulty concentrating due to depression and anxiety. While the claimant appears to have the ability to attend and concentration, especially for short intervals, this may be variable depending upon his environment and mood state. He has a low level of energy, and this, in addition to feelings of depressions and anxiety, may interfere with his ability to finish whatever he may start. The claimant was able to attend and concentrate adequately during the course of this evaluation, and seemed to perform satisfactorily during structured tasks.

(Tr. 741.)

In this case, it is clear that the ALJ did consider the opinion of Dr. Anagnostis in evaluating Gaige's mental impairments. (Tr. 22, 25.) He found that, consistent with Dr. Anagnostis' mental status examination and the claimant's testimony, Gaige's "concentration, persistence, and pace are no more than mildly affected." (Tr. 25.) It appears that the ALJ erroneously stated that Gaige "ha[d] no mild deficiencies" of concentration, persistence, and pace in an earlier section of his decision but that such statement was an inadvertent error as the ALJ clarified several paragraphs later that Gaige's concentration, persistence, and pace were "no more than mildly affected." (Tr. 25.) Any such error was harmless as substantial evidence, as indicated above, and supports the ALJ's mental impairment determination. *See Morris*, 864 F.2d at 335; *Mays*, 837 F.2d at 1364. Consequently, remand is not required.

Gaige also argues that the ALJ erred in maintaining that he suffered from a "mood disorder" when the "preponderance of the evidence indicates a recurrent major depressive disorder." (Pl.'s Br. at 12.) While the Court agrees that there are several diagnoses of "depression" in the record, Gaige has failed to provide any evidence showing how a mood disorder differs from depression or why Gaige's alleged depression was not encompassed in the ALJ's finding at Step Two that Gaige suffered from a severe mood disorder. Depression is often evaluated under section 12.04 of the Listing as an affective disorder, which are "[c]haracterized by a **disturbance of mood**, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04 (emphasis added). *See, e.g., Wilkerson v. Astrue*, No. 1:10-CV-00305-SAA, 2011 WL 2471727, at *3 (N.D. Miss. June 21, 2011) ("After careful review of the record and the ALJ's decision, the undersigned finds that the ALJ considered the evidence of depression and properly evaluated it under Listing 12.04 as an affective disorder at step 2 of the sequential evaluation."). Furthermore, Dorland's Illustrated Medical Dictionary

defines "major depressive disorder" as a "**mood disorder**" characterized by the occurrence of one or more major depressive episodes and the absence of any history of manic, mixed, or hypomanic episodes. Dorland's Illustrated Medical Dictionary 557 (31st ed. 2007) (emphasis added). Because there is no evidence the ALJ erred, remand is not required.[10]

Gaige further claims that the ALJ erred by failing to consider the impact of his mental impairments upon his perception of symptoms. (Pl.'s Br. at 12.) Specifically, Gaige states:

> The ALJ's rejection of the Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms may be impacted by his failure to fully consider the extent and severity of the Plaintiff's depressive disorder. Social Security Ruling 88-13, which establishes the basic policy of the Commissioner with regard to the evaluation of symptoms, including pain, has long held that "[w]hen medical signs and laboratory findings do not substantiate any physical impairment capable of producing the alleged pain (and a favorable determination cannot be made on the basis of the total record), the possibility of a mental impairment as the basis for the pain should be investigated." While this Ruling has been superseded by more recent rulings, the basic principle described above has never been overruled by the Commissioner.

(*Id.*)

Contrary to Gaige's argument, the ALJ did not fail to fully consider the extent and severity of Gaige's depressive disorder. As discussed above, the ALJ found that Gaige suffered from a severe mood disorder, went through the evidence in the record relating to Gaige's mental impairments, made specific findings relating to Gaige's mental impairments, and, ultimately, based on substantial evidence in the record, determined that Gaige's mental impairments did not affect his RFC. (Tr. 19-26.) In addition, the ALJ properly considered Gaige's statements regarding the intensity, persistence and limiting effects of his symptoms and determined, based

---

[10] Gaige also argues that the ALJ erred in mischaracterizing Gaige's mental impairments by using a "substantial evidence' standard instead of a "preponderance of the evidence" standard. (Pl.'s Br. at 12.) In making this argument, Gaige relies on a final rule from the Commissioner stating that the preponderance of the evidence standard is applied at all levels of administrative review, including ALJ decisions. (*Id.*) Regardless of the final rule, "this court is not part of the administrative review process; the substantial evidence standard, not the preponderance of evidence standard, governs here." *Jones v. Astrue*, No. 3:10-CV-2342-D, 2011 WL 2633793, at *4 (N.D. Tex. July 5, 2011). *See Clarification for Evidentiary Standard for Determinations and Decisions*, 73 Fed. Reg. 76,940-02, 76,941 (Dec. 18, 2008).

on the evidence in the record, that Gaige's statements regarding his subjective pain-related and other limitations were "overstated." (Tr. 26.) The ALJ did not find that medical signs and laboratory findings did not substantiate <u>any</u> physical impairment capable of producing Gaige's alleged pain. Instead, the ALJ found that the medical record did not support all the limitations and pain claimed by Gaige and that his credibility was entitled to only "limited weight." (Tr. 26.)

### C. Step Five Errors

Gaige further argues that the ALJ erred at Step Five in determining that there was work that existed in the national economy that Gaige could perform. (Pl.'s Br. at 13-17; Pl.'s Reply at 4.) In his brief, Gaige, *inter alia*, argues:

> The ALJ found that the Plaintiff can perform sedentary work[11] but needs the opportunity "to alternate sitting and standing, as desired, to alleviate pain or discomfort." The VE testified that the jobs she had described and which were relied upon by the ALJ can be performed if an individual has to alternate position every thirty minutes but not if an individual is constantly getting up and down. Thus, the need to alternate position "as desired," as found by the ALJ, would not allow for the performance of the alternative jobs upon which the ALJ has relied.

(Pl.'s Br. at 13 (citations omitted) (footnote inserted).) The government fails to address this argument.

At the hearing, the following exchange occurred between the ALJ and Patricia Knight, the Vocational Expert ("VE"):

> [ALJ:] Okay. All right I'm going to ask you to consider a person of Mr. Gaige's age, education and work history with a residual functional capacity for sedentary work, that's no lifting more than 5 pounds frequently or 10 pounds occasionally, standing or walking for only 2 out of 8 hours, sitting for up to 6. I'm also going to put an additional

---

[11] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. 20 C.F.R. §§ 404.1567(a), 416.967(a).

restriction that he should be able to change, alternate sitting and standing on an **at will** basis. Based on that could such a person return to any past work?

[VE:] I have a problem with the terminology **at will**.

[ALJ:] Okay.

[VE:] If somebody needs to you know stand up periodically you [sic] every 30 minutes or so I don't see a problem. But if somebody is constantly getting up and down, that's going to [inaudible].

[ALJ:] All right. So if we, if we made it sedentary with needing to alternate sitting and standing say on an hourly basis, does that change your opinion?

[VE:] No. Such an individual could perform the customer service position.

[ALJ:] Does your answer change if it's every 30 minutes?

[VE:] I would say no, Your Honor.

[ALJ:] You would say not they could not do it or—

[VE:] No they could, they could perform the job.

[ALJ:] Okay. Now if a person because of side effects of either medication or drowsiness is restricted to only simple repetitive job tasks, would they be able to perform any past work?

[VE:] No, Your Honor.

[ALJ:] Would there be any jobs?

[VE:] Within—

[ALJ:] Within the sedentary.

[VE:] Okay. Yes, Your Honor. Give me a moment. Such an individual would be able to perform interviewer positions. In Texas 2,958 positions and in the United States 32,253. [Inaudible] Park Texas 1,320 in the United States 18,454. General Office Clerk in the United States 7,005. I'm sorry that's the Texas number 7,005.

[ALJ:] Okay.

[VE:] And in the United States 95,490 [inaudible].

[ALJ:] **Now would any of these accommodate the sitting and standing for alternating every 30 minutes?**

[VE:] **Yes. I don't see that as being a problem for those positions,** Your Honor.

(Tr. 57-58 (emphasis added).)

As noted above, the ALJ found that Gaige had the RFC to perform sedentary work, "except he must be able to alternate sitting and standing, **as desired,** to alleviate pain or discomfort; also, due to pain and effects of pain medication, he is limited to simple, repetitive job tasks." (Tr. at 19 (emphasis added).) In his decision at Step Five, the ALJ stated:

> If the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.28 (Table No. 1 of the Medical-Vocational Guidelines). However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been compromised by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, I asked the vocational expert whether jobs exist in the national economy for a hypothetical individual the same age as the claimant, and with his same education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of the following representative occupations, in the numbers shown.
>
> 1. Interviewer, an unskilled occupation with 2,958 positions in Texas and 32, 263 nationally.
>
> 2. Order clerk, an unskilled occupation with 1,320 positions in Texas and 18,456 nationally.
>
> 3. General office clerk, with 2,005 positions in Texas and 95,490 nationally.
>
> Pursuant to SSR 00-4p, I find the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles.
>
> Based on the testimony of the vocational expert and considering the claimant's age, education, work experience, and residual functional

capacity, I conclude he is capable of making a successful adjustment to other occupations with jobs that exist in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. 27-28.)

In this case, the ALJ specifically found, based on substantial evidence in the record, that Gaige had the RFC to perform sedentary work but, *inter alia*, needed to alternate sitting and standing, *as desired*. At Step Five, the ALJ relied on the VE's testimony in making his determination that Gaige was not disabled because there were other jobs that existed in the national economy that Gaige could perform.[12] The exchange between the VE and the ALJ at the hearing makes it clear that the ALJ was aware that the VE's testimony that there were other jobs available in the national economy that Gaige could perform was based on the fact that Gaige needed to alternate sitting and standing every 30 minutes, as opposed to "at will." The ALJ did not use the language "at will" in his RFC determination; but, instead, chose to use the language "as desired." Although "at will" is similar to "as desired," it appears, based on a reading of transcript of the hearing and the ALJ's decision, that the ALJ's intentional use of the phrase "as desired" as opposed to "at will" was meant to incorporate the requirement that Gaige needed to alternate sitting and standing every thirty minutes. This interpretation is further supported by the following statement made by the ALJ later in his decision:

---

[12] *See* S.S.R. 96-9p which states:

> An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

SSR 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996).

Given, the above, I have recognized he should have the opportunity **to alternate sitting or standing every 30 minutes** if pain flares up. I have further considered he is limited to jobs with tasks that are simple and repetitive if pain and medication affects his concentration. I believe this residual functional capacity for a reduced range of sedentary work is quite generous, given the lack of objective findings that would validate his allegation of total disability.

(Tr. 25 (emphasis added).)

Based on a reading of the entire ALJ decision as well as the testimony between the ALJ and the VE at the hearing, any error by the ALJ in using the terms "as desired" in the RFC determination is harmless as it is clear that the ALJ intended to limit the need to alternate sitting or standing every 30 minutes. Because there is substantial evidence supporting the ALJ's decision at Step Five that he could perform other jobs that existed in the national economy based on his RFC determination, remand is not required.

Gaige further argues that there is a conflict between the VE's testimony regarding the jobs that Gaige could perform and the information contained about such jobs in the Dictionary of Occupational Titles ("DOT"). (Pl.'s Br. at 13-17; Pl.'s Reply at 4-7.) Specifically, Gaige states:

The ALJ limited the Plaintiff to no more than "simple" work. The Dictionary of Occupational Titles, published by the U.S. Department of Labor, classifies jobs pursuant to the reasoning development levels required. . . .

Submitted herewith as an Appendix are lists of all the jobs identified by the DOT in the fields of interviewer, order clerk and general office clerk at the sedentary exertional level (where available). The ALJ found that the Plaintiff is limited to no more than a restricted range of sedentary work. Jobs of interviewer, at the sedentary exertional level, are described by the DOT as at reasoning level 3 through 5. The higher the number, the more complex or detailed is the work. As reasoning level 3 requires carrying out instructions furnished in written, oral, or diagrammatic form and involves problems with several concrete variables; and as such level is even more complex than reasoning level 2, which involves detailed written or oral instructions; there is no evidence that the Plaintiff could perform jobs at reasoning level 3 through 5 when the ALJ limited him to no more than "simple" work. Similarly, all of the other sedentary order clerk jobs recognized by the Dictionary of Occupational Titles are at reasoning level 3, with the exception of the job of industrial-order clerk which is at reasoning level 4. Hence, the ALJ has not established that the Plaintiff can perform the jobs of order clerk.

The only job of general office clerk recognized by the <u>DOT</u> is at the light exertional level. Thus, the Plaintiff lacks the physical ability to perform this job, according to the ALJ's findings.

(Pl.'s Br. at 13-15 (internal citations and footnotes omitted).)

When, as here, the ALJ reaches his disability determination at Step Five, it means that the claimant established a *prima facie* case of disability and the burden shifted to the Commissioner to show that other work exists in the national economy that the claimant can perform despite his impairments. *See Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987); *Allsbury v. Barnhart*, 460 F. Supp. 2d 717, 720 (E.D. Tex. 2006). When determining whether the claimant could adjust to alternate work that is within his RFC and that exists in significant numbers in the national economy, the ALJ may consult several sources, including the DOT and/or a VE. 20 C.F.R. §§ 404.1566(a), (d), (e), 416.966(a), (d), (e); *see Gaspard v. Soc. Sec. Admin. Comm'r.*, 609 F. Supp. 2d 607, 612 (E.D. Tex. 2009). The availability of more than one approved source, however, presents the risk of conflict between the DOT's job descriptions and the VE's opinion regarding both the claimant's ability and the jobs' availability. *Gaspard*, 609 F. Supp. 2d at 613.

The Fifth Circuit has held that where there is a conflict between the VE's testimony and the DOT, the ALJ may rely upon the VE's testimony, provided that the record reflects an adequate basis for doing so. *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). Because this type of conflict surfaced somewhat frequently, the Commissioner issued SSR 00-4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony. SSR 00-4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000). Specifically, the ruling unambiguously establishes the ALJ's affirmative duty to bring to light and explain any possible conflict between the VE's testimony and the DOT:

> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any

possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:

> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and

> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, at *4.[13]  When there is a conflict, neither the DOT nor the VE evidence automatically "trumps" the other.  *Id.*  The conflict must be resolved by determining whether the VE's explanation is reasonable and provides a basis for relying on the VE testimony rather than on the DOT information.  *Id.*  The ALJ must explain in his decision how any conflict that has been identified was resolved.  *Id.*

The first issue in this case is whether a conflict actually exists between the VE's testimony and the information contained in the DOT.  As stated above, the ALJ found in his RFC determination, the Gaige had the ability to, *inter alia*, perform sedentary work and was "limited to simple, repetitive job tasks."  (Tr. 19.)  The ALJ also found, based on the testimony of the VE, that Gaige could perform the jobs of interviewer, order clerk, and general office clerk.  (Tr. 27-28.)  Although neither the VE nor the ALJ identified any of the specific DOT codes associated with such positions, the ALJ stated in his decision that the VE's "testimony was consistent with the information contained in the Dictionary of Occupational Titles."  (Tr. 28.)  In addition, Gaige presented evidence with his brief that two of the 11 interviewer positions listed in the DOT are

---

[13] Social Security rulings represent "statements of policy and interpretations" adopted by the Social Security Administration that are "binding on all components" of the Administration.  20 C.F.R. § 402.35(b)(1). While binding on the Administration, these interpretive rulings are not binding on the courts, so courts need not give them the force and effect of law.  *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (noting the varying degrees of deference the rulings may be afforded); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam).  However, courts may, as the Fifth Circuit frequently has, "rel[y] upon the rulings in evaluating ALJs' decisions."  *Myers*, 238 F.3d at 620.

classified as unskilled[14] and have a reasoning development level ("RDL") of 3, three of the 15 order clerk positions are classified as unskilled and have a RDL of 3, and the one general office clerk position, which is rated as semi-skilled[15] light work,[16] has a RDL of 4. (Appendix to Plaintiff's Brief ("Pl.'s App.") at 2-4.)

At a RDL of 3, Gaige would need to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and d]eal with problems involving several concrete variables in or from standardized situations." DOT, app. C at 1011. Contrary to Gaige's argument that he could not perform jobs at the RDL of 3 because such jobs are not "simple," "the fact that instructions may be various, furnished in multiple forms, or detailed, does not preclude them from being simple." *Pete v. Astrue*, No. 08-774, 2009 WL 3648453, at *5 (W.D. La. Nov. 3, 2009.) A reading of the definition of RDL of 3 does not, on its face, indicate that jobs with a RDL of 3 involve more than simple, repetitive work. Furthermore, the classification of the specific jobs identified above as "unskilled" indicates "that they are by definition simple." *Id.* Consequently, the Court concludes, based on the facts of this case in which the jobs mentioned by the VE and specifically identified by Gaige are both unskilled and have an RDL of 3, that there is not a conflict between the VE's findings and the information

---

[14] SVP, or Specific Vocational Preparation, refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a particular occupation. *See* DOT app. C, 1009 (rev. 4th ed.1991). Jobs having a specific vocational preparation (SVP) of 1 to 2 are defined as "unskilled work." SSR 00-4p, 2000 WL 1898704, at *3 (citing 20 C.F.R. §§ 404.1568, 416.968).

[15] Jobs having a SVP of 3-4 are defined as "semi-skilled" work. SSR 00-4p, 2000 WL 1898704, at *3 (citing 20 C.F.R. §§ 404.1568, 416.968).

[16] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds; even if the weight lifted is very little, a job is also in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

contained in the DOT. Thus, substantial evidence supports the ALJ's decision at Step Five and remand is not required.

Furthermore, even assuming that there was a conflict between the VE's testimony and the information contained in the DOT, such a conflict is not a direct or facial conflict; instead, it would be an implied or indirect conflict. "All kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation." *Adams v. Astrue*, No. CV-07-1248, 2008 WL 2812835, at *3 (W.D. La. June 30, 2008). "The Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provision of the DOT, and then present the conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing. *Id.*; *see Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000.) Gaige, who was represented by an attorney at the hearing before the ALJ and whose attorney was specifically asked by the ALJ if he had any questions regarding the VE's testimony (Tr. 58), did not raise any such implied conflict at the administrative hearing. Consequently, Gaige will not now be permitted to peruse the record in search of a conflict to present as reversible error and, instead, is found to have waived such argument. *See, e.g., Young v. U.S. Comm'r Soc. Sec.*, No. CV08-0474, 2009 WL 2827945, at *13 (W.D. La. Sept. 1, 2009).

## **RECOMMENDATION**

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until **March 15, 2013**, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED March 1, 2013.

_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv